The STATE of Utah, Plaintiff and Respondent,

v.

Calvin R. BARTHOLOMEW, Defendant and Appellant.

No. 19580.

Supreme Court of Utah.

July 15, 1986.

Glenn K. Iwasaki, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., J. Stephen Mikita, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

STEWART, Justice:

The defendant was convicted by a jury of two counts of issuing a bad check, one count a second degree felony and the other a third degree felony. On this appeal, the defendant contends (1) that he was denied the effective assistance of counsel at trial and (2) that the State failed to establish a prima facie case against him. We affirm.

On the 17th and 18th of May 1983, the defendant placed two orders with Cannon Securities in Salt Lake City for the purchase of a total of 13,000 shares of Cisco Petroleum stock. The broker informed the defendant that he had seven days to pay for the stock. After the stock was ordered, Cannon transferred the stock from its inventory of Cisco stock to an account opened in the name of the defendant's company, Kiowa Marketing. On May 24, the day payment was due on the first purchase, the defendant left two checks at Cannon's offices, one for $490 and one for $1,605, and Cannon deposited the checks the same day. The defendant's bank account balance at the time he drew the checks was $68.33. On May 27, 1983, the checks were returned to Cannon by the

bank because of insufficient funds. Three days later, May 30, he was arrested. The defendant's bank account balance between May 11 and May 29 did not exceed $268.33.

The defendant's version of the facts is essentially as follows. Prior to placing the order for the stock, the defendant, who was out of town, borrowed $1,605 from a friend. The defendant testified that he kept $605 of that amount and wired the remaining $1,000 to his girlfriend, Sandra Wallace, with whom he lived, with instructions to deposit that amount in his bank account. It is not clear why the $1,000 was not wired to his own bank. Wallace testified that when she attempted to deposit the money at a drive-in branch on May 20, 1983, the teller, for some unexplained reason, would not accept the money at the drive-in window and requested her to come into the building. Because she had recently had an operation and did not feel able to, she refused to do so and kept the money. On May 24, some three days after the defendant returned to Salt Lake, she informed him that she had not made the deposit. He did not collect the money from her or ask her to deposit it in his account, but allowed her to keep the money.

The defendant also presented evidence that he endeavored to have his mother, Leona Bartholomew, transfer funds to his bank to cover his checks. She testified that she was prepared to transfer up to $2,000 from an account she held jointly with her son in a bank in Las Vegas to his account in Salt Lake, but because he did not give her instructions as to how much to transfer, the transfer was not made. She also testified that on May 27, before the checks had been picked up by the Salt Lake County Attorney's Office, she called Cannon Securities at the defendant's request and talked to a Mr. Nezlen or Mr. Nelson, who told her that the checks had been picked up.[1] Mr. Nelson testified, however, that he had neither a written notation nor an independent recollection of a conversation with Mrs. Bartholomew and that he would have made a written notation of any conversation with her.

Because the defendant was not an established customer, Cannon Securities made no attempt to contact him to cover the unpaid checks, and on June 1, the checks were turned over to the Salt Lake County Attorney's office for prosecution. Subsequently, a Mr. Brent Cook offered to pay Cannon Securities for the securities if it would drop the prosecution. His offer to pay was withdrawn when Cannon informed him that it had not instigated the action and was unable to prevent the prosecution from proceeding. The defendant asserts that he did not receive actual notice from the bank that the checks had been dishonored until June 7, 1983, the day he was arraigned.

The trial judge gave the jury a mistake of fact instruction, which stated that it should find the defendant not guilty if the defendant "issued the check[s] believing that sufficient funds had been deposited in his account ..." to cover the checks. The jury rejected the defense and found the defendant guilty on both counts.

On appeal, the defendant raises two issues: (1) that he was denied the effective assistance of counsel and (2) that there was insufficient evidence to support the convictions.

## I.

■ The defendant contends that under the standards established in *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), and *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), he has been denied the effective assistance of counsel under the Sixth Amendment to the United States Constitution. Specifically, he argues that he is entitled to a reversal because his trial

---

1. It appears that the bank had no employee by the name of Nezlen and that Mr. Nelson may have been the person to whom she referred.

attorney did not "require the State to charge appellant with the amended statute," i.e., subparagraph (2) of U.C.A., 1953, § 76–6–505 (Repl.Vol. 8B, 1978 ed., Supp. 1985), which would have entitled him to make the checks good within a fourteen-day period from the date of actual notice of nonpayment.[2] Section 76–6–505 provides:

> (1) Any person who issues or passes a check ... for the purpose of obtaining from any person, firm, partnership, or corporation, any ... thing of value ... knowing it will not be paid by the drawee and payment is refused by the drawee, is guilty of issuing a bad check.
>
> ....
>
> (2) Any person who issues or passes a check or draft ... for the purpose of obtaining from any person, firm, partnership, or corporation, any ... thing of value ... payment of which check or draft is legally refused by the drawee, is guilty of issuing a bad check or draft if he fails to make good and actual payment to the payee in the amount of the refused check or draft within 14 days of his receiving actual notice of the check or draft's nonpayment.

The defendant was charged and convicted under § 76–6–505(1). That section requires the State to prove that a defendant issued a bad check *knowing* that it would not be paid by the drawee at presentment and that the defendant issued the check for the purpose of obtaining something of value. *See State v. Delmotte*, 665 P.2d 1314 (Utah 1983).

Section 76–6–505(2), on the other hand, does not require the prosecution to prove that a defendant knew that a check he issued would not be paid upon presentment. Thus, if a person writes a bad check and does not know that there are insufficient funds in his account, or negligently or in good faith believes that it will be paid and it is not, then he is not guilty of issuing a bad check unless he fails to make good on the check within fourteen days after

actual notice of nonpayment by the drawee. Thus, subparagraph (2) of § 76–6–505 makes criminal the issuance of bad checks in certain circumstances which subparagraph (1) does not reach.

We forego a discussion of the principles relating to the effective assistance of counsel which were enunciated in *Strickland* and *Cronic* because the defendant's trial counsel could not possibly have compelled the prosecution to charge the defendant under subparagraph (2), as the defendant argues his trial counsel should have done. At most, the defendant had a right to move for a dismissal of the information, but the defendant offers no plausible ground upon which such a motion could be predicated. Defense counsel could also have moved, and in fact did move, for a directed verdict of acquittal, which the trial court denied. The evidence was clearly susceptible to the interpretation that the defendant knew that the checks he issued would not be honored at the time of presentment to his bank, and the jury so found. In fact, the defendant does not even contend on appeal that there is insufficient evidence to support the jury's finding on that issue.

To be sure, the defendant argues in his second point on appeal that the trial court erred in failing to grant the defense counsel's motion to dismiss for failure of the State to prove a prima facie case. But that motion actually tends to undermine the defendant's argument that trial counsel did not perform to constitutional standards of effectiveness by seeking to have the charges against the defendant dismissed.

## II.

◼ With respect to the defendant's contention that the State's evidence was insufficient to establish a prima facie case, the defendant contends on this appeal only that Cannon Securities did not part with anything of value under the statute, *see State v. Green*, 672 P.2d 400 (Utah 1983), be-

---

**2.** *See* 1983 Laws of Utah ch. 92, § 1.

cause stock certificates were never issued to Kiowa Marketing, even though the shares purchased were booked into Kiowa's account. Although that is true, the defendant, irrespective of the technical issue of whether he had actually acquired legal title to the stock, did receive "a thing of value" within the meaning of that term as used in § 76–6–505 by acquiring the rights to order the stock in his account sold and to receive any profit that might be realized from such a sale. Therefore, this case does not fall within the scope of the holding in *State v. Green,* 672 P.2d 400 (Utah 1983).

Affirmed.

HALL, C.J., and HOWE, DURHAM and ZIMMERMAN, JJ., concur.